**Slimp KISER, on behalf of himself and all others similarly situated, et al.**

v.

**Harry HUGE et al., and United Mine Workers of America Welfare and Retirement Fund of 1950, Appellants.**

No. 73–1393.

United States Court of Appeals, District of Columbia Circuit.

Argued April 23, 1974.

Decided Aug. 5, 1974.

For en banc opinion see 171 U.S. App.D.C., 517 F.2d 1275.

Daniel L. O'Connor, Washington, D. C., with whom J. Michael Farrell, Washington, D. C., was on the brief, for appellees Kiser, et al.

Lewis D. Sargentich, Washington, D. C., with whom Joseph A. Yablonski, Clarice R. Feldman, Daniel B. Edelman, Washington, D. C., and Steven B. Jacobson were on the brief, for United Mine Workers of America as amicus curiae on the Matter of Attorneys' Fees.

Fred M. Vinson, Jr., Washington, D. C., with whom Michael P. Bentzen, Joseph A. Rafferty, Jr., Joseph T. McFadden, Washington, D. C., and M. E. Boiarsky, Charleston, W. Va., were on the brief, for appellants.

Julian H. Singman, Washington, D. C., with whom Martin Shulman, Washington, D. C., was on the brief, for plaintiff/intervenor-appellees.

Before EDWARDS,* United States Circuit Judge for the Sixth Circuit, and TAMM and WILKEY, Circuit Judges.

WILKEY, Circuit Judge:

This case and its companion, Pete v. UMWA Welfare and Retirement Fund of 1950, 170 U.S.App.D.C. ——, 517 F.2d 1267, No. 73–1270, are the latest in a series of legal confrontations between retired mine workers and the Trustees of the United Mine Workers of America Welfare and Retirement Fund of 1950 (the Fund). That the present controversies have proceeded to this stage without some extrajudicial resolution is attributable not so much to the novelty of the legal issues, for the governing law is fairly clear, nor to the need for an intensive factual inquiry, for the material facts are on the whole uncontroverted.. Rather, these controversies owe their lives to the continuing intractability of the Trustees in the face of a series of unambiguous pronouncements by this court designed to guide the Trustees in the discharge of their obligations to the Fund's beneficiaries. The individuals serving as Trustees have changed from time to time during the course of this extensive litigation, as have their legal counsel, and all the incumbent Trustees were not participants in the major actions described herein. We hope that our affirmance of the orders entered below, granting the plaintiff classes summary judgment, will help close the book on this chapter, in the annals of litigation.

### I. Background

The fund is an irrevocable trust established by the National Bituminous Coal Wage Agreement of 1950 under the authority of section 302(c)(5) of the Labor-Management Relations Act of 1947.[1] It is administered by three Trustees: one selected by mine operators who have signed the Agreement (signatories), one designated by the United Mine Workers of America, and one neutral selected by the other two. Each signatory operator must pay into the Fund royalties based on the quantity of coal it produces. From the accumulated royalties and the income earned by investing the Fund's principal, the Trustees are charged with paying various benefits to employees of the coal operators, including medical and hospital costs, pensions, and compensation for work-related injuries and illnesses. Under the Agreement, the Trustees have full authority to establish criteria with respect to eligibility for benefits. The pension plan adopted by the Trustees provides for flat monthly payments to all retired miners who meet applicable eligibility criteria.[2]

The plaintiff class in this case consists of all miners who retired after 1 February 1965 and who met all pension eligibility requirements in effect at the time they applied, except the so-called "signatory last-year employment requirement." This requirement, embod-

---

* Sitting by designation pursuant to 28 U.S.C. § 291(a).

1. 29 U.S.C. § 186(c)(5) (1970).

2. In Roark v. Boyle, 141 U.S.App.D.C. 390, 439 F.2d 497 (1970), we stated: "[W]e cannot say that the law condemns outright, as inherently unreasonable, a flat pension plan that pays an equal amount to all pensioners meeting reasonable eligibility requirements." *Id.* at 394, 439 F.2d at 501.

ied in Resolution No. 63 of the Fund's Trustees,[3] provided that an applicant was eligible for a pension only if he had "[p]ermanently ceased work in the coal industry immediately following regular employment for a period of at least one (1) full year as an employee in a classified job for an employer signatory to the National Bituminous Coal Wage Agreement . . . ."[4]

The plaintiffs-appellees filed their complaint on 28 February 1970, 14 days after this court issued its pivotal opinion in Roark v. Boyle[5] *Roark II*. Earlier, in Roark v. Lewis[6] (*Roark I*), we had concluded that the signatory last employment requirement of Trustees' Resolutions Nos. 56 and 57, as applied to miners with several years of total signatory service, was *prima facie* unreasonable. We afforded the Trustees an opportunity to show "what, if any, reasonable relationship exists between the purposes of the Fund and the requirement that an employee's last regular employment be with a signatory operator."[7] In *Roark II*, we found that such a re-

quirement induces miners to continue serving a signatory operator until their departure from the coal industry, and thereby advances the legitimate objective of "prevent[ing] non-contributing employers who made no pension contribution from getting the benefit of miners" who have acquired training and experience in the service of a contributing employer.[8] However, we held that a bare signatory last employment requirement is arbitrary and irrational, since it permits a miner who worked just one year, his last, for a signatory employer to receive a pension, while it denies pension benefits to a miner who accumulated several years of signatory service but retired from the employ of a nonsignatory operator. We concluded that the three plaintiffs, who had accumulated from 9 to 15 years' signatory service, were "entitled to a declaration that the signatory last employment requirement is invalid as applied to them and that they are entitled to a pension if they met the other eligibility requirements in effect at the time their pension applications were filed."[9] We reached the

---

3. Resolution No. 63 was adopted by the Trustees on 4 January 1965. The pertinent provisions of this and all other resolutions discussed herein are set out in the Appendix to this opinion.

4. The class herein was certified as a valid class under Fed.R.Civ.P. 23(b)(3) by order of the District Court on 6 August 1971, as amended on 4 January 1972. Members of the class constitute a finite number of retired miners who are easily identifiable through the records of the Fund. The District Court ordered that the Fund "allow plaintiffs to examine the records of the 472 applicants denied pension benefits pursuant to . . . paragraph I.A.3., Resolution No. 63 from February 1, 1965 to date, and that plaintiffs notify the members of this class . . . of the pendency of this suit." Since provision was made for notice by class representatives to all class members, this class action meets the requirements of Fed. R.Civ.P. 23(c)(2), as most recently interpreted by the Supreme Court in Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974). Members of the class in the companion *Pete* case, 170 U.S.App.D.C. ——, 517 F.2d 1267,

No. 73–1270, are all miners who retired *prior* to 1 February 1965 anl who were denied pension benefits pursuant to the requirement in Trustees' Resolution No. 56, as amended by No. 57, that a miner have "[p]ermanently retired from and ceased work in the Bituminous Coal Industry after May 28, 1946, following regular employment in a classified job . . . as an employee of an operator signatory to the National Bituminous Coal Wage Agreement of 1950 . . . ." This requirement is referred to as the "signatory last employment requirement." Throughout this opinion, the signatory *last-year* employment requirement of Resolution No. 63 is treated as one variety of signatory last employment requirement.

5. 141 U.S.App.D.C. 390, 439 F.2d 497 (1970).

6. 130 U.S.App.D.C. 360, 401 F.2d 425 (1968).

7. *Id.* at 363, 401 F.2d at 428.

8. 141 U.S.App.D.C. at 399, 439 F.2d at 506.

9. *Id.* at 402, 439 F.2d at 509.

same result in the companion case of Collins v. UMWA Welfare and Retirement Fund of 1950.[10]

Since the court in *Roark II* perceived that the signatory last employment requirement could serve a legitimate purpose in some situations, we stated that such a requirement "can be valid," but

> only if it is in context of a plan that conditions eligibility on a period of contributory employment that is of sufficiently significant duration to warrant eligibility for a flat pension. A period less than five years would manifestly not be sufficient under this standard.[11]

We further indicated that if the Trustees chose to retain the objectionable requirement in a validating context, they would "have discretion to make their amended regulation retrospective, in the sense of being applicable to applications hereafter filed even though they relate to past retirements."[12] We continued, "Similarly we think such provisions may be made applicable to applications heretofore rejected and subsequently presented for reconsideration."[13]

On 14 January 1971 the Trustees approved Resolution No. 83, which contained a signatory last-year employment requirement for miners who retired on or after 1 February 1965,[14] as in the case of members of the plaintiff class. In an attempt to follow *Roark II* and supply a validating context for this requirement, the Trustees added a provision that "an applicant . . . must have worked, after May 28, 1946, [a minimum of five] years of signatory service . . . ."[15] However, Resolution No. 83 by its terms applied only to applications received on or after 1 April 1971. Those received before that date were subject to the resolution then in effect.[16]

Subsequently, on 25 June 1971, we handed down our decision in DePaoli v. Boyle.[17] DePaoli had retired after 1 February 1965 and had filed his pension application before 14 August 1970, the date *Roark II* was decided. Before his retirement, he had accumulated over eight years of total signatory service, but he retired from the coal industry at a time when he was self-employed. His pension application was denied on the ground that he failed to meet the signatory last-year employment requirement of Resolution No. 63. We held that DePaoli was in the same position as Roark and Collins and was therefore entitled to the same relief. We assessed the effect of Resolution No. 83 on the case in the following manner:

> [T]he new Resolution No. 83 makes no provision whatsoever for persons such as DePaoli who, like Roark and Collins, had filed before 14 August 1970 and had been denied pensions on the basis of the signatory last employment requirement declared unlawful in the *Roark* case. The net result of the trustees' action is not to accept the in-

---

10. 141 U.S.App.D.C. 387, 439 F.2d 494 (1970).

11. 141 U.S.App.D.C. at 401, 439 F.2d at 508.

12. *Ibid.*

13. *Ibid.*

14. *See* Appendix. For miners like those in the *Pete* class who retired *before* 1 February 1965, Resolution No. 83 maintained the requirement of Resolutions Nos. 56 and 57 that the miner have "[c]eased work in the bituminous coal industry following regular employment as an employee in a classified job for an employer signatory to the bituminous coal wage agreement then in effect."

15. *See* Appendix. The five-year requirement applied to applications received between 1 April 1971 and 31 December 1976. The requisite number of years increased to six for applications received during 1977, seven for 1978, and so on. A ten-year requirement was to apply during 1981 and thereafter.

16. Resolution No. 83 also provided:
 Applications received in the office of the Trust Fund during the period August 14, 1970, through March 31, 1971, which do not satisfy the requirements of regulations in effect during that period, shall be reviewed subject to the terms of this Resolution.

17. 144 U.S.App.D.C. 364, 447 F.2d 334.

vitation of the court to make the new eligibility requirements retroactive in an equitable and valid context, as in their discretion the trustees might have done, but specifically to promulgate as far as DePaoli and others similarly situated are concerned the very eligibility requirements struck down in *Roark*.[18]

On 28 January 1972, in Belcher v. Carey,[19] we affirmed the District Court's decision in favor of retired miners who had filed their pension applications before 14 August 1970, had been denied benefits solely on the basis of the signatory last employment requirement of Resolution No. 63, and had filed suit prior to 14 August 1970.

On 2 March 1972 the Fund's Trustees promulgated Resolution No. 89, which attempted to give Resolution No. 83 retroactive effect with respect to applications received before 14 August 1970. However, on 12 May 1972, in Teston v. Carey,[20] we held that a miner whose situation was "virtually identical" to that of DePaoli [21] was entitled to relief under the *Roark II* and *DePaoli* decisions. In so doing, we indicated dissatisfaction with the manner in which the Trustees had exercised the discretion that we had conferred on them in *Roark II*:

> [T]he manner in which the Trustees have perpetuated the final year of service for a signatory employer requirement under Resolution 83 is not fair and equitable . . . .
>
> . . . . . .
>
> For the guidance of the Trustees, our failure to strike out the signatory last employment requirement *totally*, our recognition that "new eligibility regulations . . . might contain the signatory last employment requirement in a validating context, . . . .

if such were fair and equitable," should not be interpreted as a validation of the signatory last employment requirement in every context for every purpose.

Indeed, such a requirement is probably not fair and equitable in the circumstances of most pension applicants.[22]

The Trustees subsequently approved Resolution No. 90, which retained the total signatory service requirement of Resolution No. 83 but eliminated the signatory last employment criterion. In its place, the Trustees imposed a requirement that a miner have worked a specified number of years for a signatory employer during his last five years in the coal industry. The number of years required for each miner is inversely related to his total years of signatory service.[23]

On 19 January 1973 the District Court granted summary judgment to the plaintiff class, a decision which we will discuss more fully below.[24] The court issued a Supplemental Memorandum Opinion and Order on 6 February 1973. On 26 February 1973 the District Court approved a settlement agreement reached by the parties on 2 January in the related case of Blankenship et al. v. UMWA Welfare and Retirement Fund of 1950, et al.[25] The class in *Blankenship* included, *inter alia*, miners who had retired before 1 April 1971, had completed at least twenty years of service in the industry at any time, and had accumulated at least five years of signatory service after 28 May 1946. Members of the *Pete* and *Kiser* classes were explicitly excluded. The settlement agreement provided that class members were to be put on the pension rolls as soon as feasi-

---

18. *Id.* at 367, 447 F.2d at 337 (footnotes omitted).

19. No. 71–1622 (unreported).

20. 150 U.S.App.D.C. 256, 464 F.2d 765.

21. *Id.* at 258, 464 F.2d at 767.

22. *Id.* at 260, 464 F.2d at 769 (emphasis original).

23. Resolution No. 90, ¶ I.A.3. (18 October 1972), Appendix.

24. Kiser v. Carey, 353 F.Supp. 736 (D.D.C.).

25. Civil Actions Nos. 2186–69, 2350–69.

ble and were to be paid one year's retro-active pension.[26]

## II. *The District Court Decision*

After reviewing the pertinent decisions of this court, the District Court found that the plaintiffs in the instant case stand in much the same position as the plaintiffs in *Roark II, DePaoli,* and *Teston.* Specifically, the court found:

> It is undisputed that all of the plaintiffs in the cases at bar were denied their pensions solely on the ground of failing to meet the signatory last employment requirement. All of the plaintiffs filed their pension applications prior to the date of the *Roark* decision. These circumstances, coupled with the strong language of the Court in *Teston* that "such a requirement is probably not fair and equitable in the circumstances of most pension applicants," compel a finding by this Court that the signatory last employment requirement as applied to the plaintiffs in the cases at bar was invalid.[27]

The court ordered that all class members be added to the pension rolls as of 1 January 1973 and be paid pension benefits retroactive to the dates on which their applications were denied. The court made eligibility for this relief subject to the further requirement that the miner have worked a minimum of one year for a signatory operator any time after 28 May 1946. In its Supplemental Memorandum Opinion and Order, the court ruled that accrued pensions were to be paid from the first day of the month following the date the miner's pension application was denied. The court also reversed its earlier decision to award plaintiffs interest on their accrued pensions. Finally, in a Memorandum Opinion and Order dated 29 August 1973, the court awarded fees of $64,773.00 to the Kiser class attorneys, $4,531.32 to the attorney for consolidated plaintiffs Moore, et al., and $3,916.75 to intervenors Adkins, et al. All these fees were taxed against the defendant Fund.[28]

We affirm the District Court's decisions in all respects, except (1) we hold that payment to plaintiffs of interest on their accrued pensions is appropriate; and (2) we remand the issue of attorneys' fees for action consistent with the standards set out herein.

## III. *Invalidity of the Signatory Last-Year Employment Requirement as Applied to Plaintiffs-Appellees*

Rejection of a pension application by the Trustees must stand unless the reviewing court finds that the Trustees' action was arbitrary or capricious.[29] All the frustrated applicants in the plaintiff class were denied pension benefits solely on the basis of the signatory last-year employment requirement of Trustees' Resolution No. 63,[30] which was the resolution in effect at the time the class members filed their applications. Implementation of a bare signatory last employment requirement,

---

**26.** The parties agreed to liquidate this amount at $1800. The Agreement recited that benefits would be paid to between 9,000 and 20,000 retired miners and widows and that the Fund's actuarial data indicated a prospective cost of at least $40 million and a retrospective cost of $12 million.

**27.** 353 F.Supp. at 740 (footnotes omitted).

**28.** Kiser v. Miller, 364 F.Supp. 1311 (D.D.C.1973). Intervenors Adkins, Hensley, and Madden are members of the plaintiff class in this case. The latter two were so classified by order of the District Court on 23 May 1973. Moore was plaintiff in a consolidated case, Moore et al. v. UMWA Welfare & Retirement Fund of 1950, 353 F.Supp. 736.

The *Moore* appeal, No. 73–1394, was dismissed by agreement of the parties.

**29.** Gaydosh v. Lewis, 133 U.S.App.D.C. 274, 275, 410 F.2d 262, 263 (1969); Roark v. Lewis, 130 U.S.App.D.C. 360, 361, 401 F.2d 425, 426 (1968); Kosty v. Lewis, 115 U.S. App.D.C. 343, 346, 319 F.2d 744, 747 (1963), cert. denied, 375 U.S. 964, 84 S.Ct. 482, 11 L.Ed.2d 414 (1964); Danti v. Lewis, 114 U.S.App.D.C. 105, 108, 312 F.2d 345, 348 (1962).

**30.** Kiser v. Carey, 353 F.Supp. 736, 737 n.1 (D.D.C.1973).

in the absence of a requirement of some substantial amount of total signatory service, has been declared arbitrary and capricious by this court in *Roark II* and its progeny.

The Trustees argue, however, that the deficiencies of Resolution No. 63 were rectified by Resolution No. 83, which by Resolution No. 89 was given retroactive effect with respect to applications received before 14 August 1970. *Roark II*, the Trustees contend, invited them to promulgate new eligibility criteria which, in their discretion, could be applied retroactively. *Roark II* also recognized that a signatory last employment requirement could advance a legitimate purpose, provided that the Trustee supplied a validating context by requiring some substantial amount of total signatory service, at least five years. The Trustees argue that they were implementing the language of *Roark II* when they (1) promulgated Resolution No. 83 with its signatory last employment requirement in the validating context of a five-year total signatory service provision, and (2) gave the new resolution retrospective application by means of Resolution No. 89. Therefore, the Trustees conclude, they can now justify their denial of pension benefits to plaintiffs-appellees on the basis of the valid signatory last employment requirement of Resolution No. 83.[31] We disagree.

■ *Roark II* gave the Trustees discretion to "make their amended regulation retrospective, in the sense of being applicable to applications *hereafter* filed even though they relate to *past retirements* . . . [and] to applications heretofore rejected and subsequently presented for reconsideration."[32] All members of the plaintiff class filed for pensions before the decision in *Roark II*, were refused benefits, and filed a complaint in the District Court alleging that the Trustees' rejection of their applications was unlawful. Thus, they are in the same position as the plaintiffs in *Roark, Collins, DePaoli, Belcher,* and *Teston,* and the following statement from *DePaoli* applies with equal force to them:

> In the language of our opinion in *Roark,* "We conclude that relief to the party before us should not be limited to reconsideration of his application under revised eligibility requirements." Those revised requirements will avail [the plaintiff] nothing. He had filed his application prior to our decision in *Roark,* he has been denied a pension on the very eligibility requirement struck down in *Roark,* and, like Roark and Collins, he deserves the same relief.[33]

The *DePaoli* analysis was not altered by the subsequent promulgation of Resolution No. 89, giving Resolution No. 83 retroactive effect, for we reached the same result based on the same analysis in Teston v. Carey,[34] which was decided two months after Resolution No. 89 was issued.

Moreover, the latitude we were willing to confer on the Trustees in *Roark II* was predicated on our assumption that the Trustees would act promptly to establish regulations that would ensure fair and equitable treatment of all pension applicants. But it was not until January 1971 that the Trustees finally acted to revise eligibility criteria, and

---

31. The governing resolution is now No. 90, which also purports to have retroactive application. What impact it would have on the pension rights of the plaintiff class is unclear since it replaced the signatory last employment requirement with a requirement that the applicant have worked a specified number of years for a signatory employer during his last five years in the industry. Given our conclusion that plaintiffs' applications are governed by Resolution No. 63, we need not explore the complexities that would arise were the provisions of Resolution No. 90 in issue.

32. 141 U.S.App.D.C. at 401, 439 F.2d at 508 (emphasis supplied).

33. 144 U.S.App.D.C. at 368, 447 F.2d at 338.

34. 150 U.S.App.D.C. 256, 464 F.2d 765 (1972).

they left the bare signatory last employment requirement in effect for applications received before 14 August 1970, despite the holding of *Roark II* that such a requirement is inequitable. Our *De-Paoli* decision made it clear to the Trustees that they had not properly exercised the discretion granted them by *Roark II*. After the cosmetic amendment of Resolution No. 83 by No. 89 in March 1972, our faith in the ability of the Trustees to exercise fairly any significant degree of discretion in establishing eligibility requirements had diminished to the point that we felt compelled to say, "[T]he manner in which the Trustees have perpetuated the final year of service for a signatory employer requirement under Resolution 83 is not fair and equitable . . . ."[35] Our recognition of discretion in the Trustees to deal with pension applications filed before 14 August 1970 had not then, and has not now, resulted in fair and equitable treatment of the beneficiaries.

■ Finally, we have held, most notably in Danti v. Lewis,[36] that a retired miner who meets all the eligibility requirements in effect at the time he files his application acquires a vested right to pension benefits that survives any subsequent attempt by the Trustees to alter eligibility criteria. The clear import of *Danti* is that we must focus our attention on the date a pension application was filed to determine what the relevant eligibility requirements were and are. In the instant case, the members of the plaintiff class filed their applications when Resolution No. 63 governed. At that time, the plaintiffs-appellees met all eligibility requirements *then in effect* except the signatory last employment requirement, which was declared invalid in

*Roark II*. Thus, under *Danti*, their pension rights vested at the time they applied and could not be undercut by the subsequent establishment of new eligibility criteria.[37]

In *Roark II* we did not say so directly, but it would seem obvious, that what would be a "validating context" for a signatory last employment requirement for *future* pension applicants might not be equitable, fair, and therefore valid, for current or past pension applicants, who would be powerless to rearrange their past lives. The five years of signatory employment the court implied to be of "sufficiently significant duration" to provide a "validating context" for a signatory last employment requirement should have been interpreted by the Trustees with this distinction in mind. An attitude on the Trustees' part that the pension Fund existed for the benefit of the miners who had labored for years and now could labor no more, rejecting any idea that the Fund existed for the Fund itself or for any benefit to the Trustees by the power inherent in the administration of such a sizable fund, would have gone a long way in preserving the Trustees from the errors of judgment they subsequently made.

## IV. *Retroactive Relief*

The District Court ordered the Trustees to pay members of the plaintiff class pension benefits retroactive to the first day of the month following the date on which each plaintiff's pension application was denied. The Trustees invite us to exercise our equitable discretion and make payments retroactive to 14 August 1970, the date of our *Roark II* decision. Until that date, the Trustees urge, they had *no notice* of the invalidity of the

---

35. *Id.* at 260, 464 F.2d at 769.

36. 114 U.S.App.D.C. 105, 312 F.2d 345 (1962).

37. *See also* Patterson v. UMWA Welfare & Retirement Fund of 1950, 346 F.Supp. 11 (E.D.Tenn.1971), in which the court stated:
 It seems unjust for the Trustees, once having recognized the arbitrariness of a

portion of Resolution No. 63 and after plaintiff had filed his claim, to pass another resolution subjecting him to the same arbitrary treatment which had been invalidated and to say they have cured the arbitrariness by inserting a new criterion that is irrelevant in this case.
346 F.Supp. at 17.

signatory last employment requirement and therefore acted in good faith in employing the requirement as a basis for rejecting pension applications. We decline the Trustees' invitation and affirm the District Court's order.

First, the Trustees' assertion that they had no notice of the invalidity of the signatory last employment requirement before 14 August 1970 is incorrect. In *Roark I*, decided 21 August 1968, we clearly indicated that, unless the Trustees could carry the burden of convincing the court that the requirement was rationally related to some legitimate purpose of the Fund, we would declare it invalid. Therefore, the Trustees had clear, unambiguous notice as early as 1968 that the signatory last employment requirement was presumptively invalid.

■ More importantly, however, we are bound by the holding of Danti v. Lewis that pension rights vest at the date a retired miner applies for benefits, if the applicant meets all eligibility criteria then in effect.[38] This principle

compels the conclusion that *the pension benefits of members of the plaintiff class began accruing on the dates when their applications should have been approved by the Trustees,* or the first day of the month after each application was denied. Since the plaintiffs-appellees were legally entitled to pension payments beginning on those dates, they must now be paid the amounts that have accrued since that time.[39] The relief granted below is also consistent with our *Roark* line of decisions. As the District Court stated, "[P]laintiffs in other cases throughout this jurisdiction have received fully retroactive pension relief . . . ."[40] The situation of the plaintiff class in the instant case is parallel to that of plaintiffs in other pension cases in this Circuit, so the plaintiffs here are entitled to the same remedy, including "fully retroactive pension relief."

We are cognizant of the observation we made in Gaydosh v. Lewis that "[t]he function of the trustees, on the

38. *See also* Lavella v. Boyle, 144 U.S.App.D.C. 35, 444 F.2d 910 (1971); Kosty v. Lewis, 115 U.S.App.D.C. 343, 319 F.2d 744 (1963), cert. denied, 375 U.S. 964, 84 S.Ct. 482, 11 L.Ed.2d 414 (1964). In *Lavella*, the appellant was denied a pension in 1967 on the basis that he had failed to fulfill the requirement of having worked in the coal industry 20 of the 30 years preceding the year of his application. The 20-out-of-30 rule had been put into effect in 1953. The court held that since plaintiff had accumulated sufficient service by 1952 to qualify under the standard then in effect and since physical disability had necessitated his retirement and prevented his fulfillment of the 20-out-of-30 rule, he "had sufficiently vested rights in 1952 which could not be cut off by the change in eligibility requirements in 1953." 144 U.S.App.D.C. at 37, 444 F.2d at 912. In *Kosty*, the miner failed to meet the eligibility requirements in effect at the time he retired. However, earlier in his career, he could have retired and qualified for a pension under the then existing criteria. The court held that he had not been given sufficient notice of the change in criteria to allow him to decide whether to continue working or to retire. Therefore, the court ordered that he be paid a pension. Gaydosh v. Lewis, 133 U.S.App.D.C. 274, 410 F.2d 262 (1969), is inapposite here. In that

case, the frustrated pension applicant failed to meet the eligibility criteria both at the time he retired (he was too young) and subsequently when he filed his application (he had reached the necessary age but did not fulfill new criteria promulgated in the intervening years).

39. Payments are to run through 31 December 1972, since as of 1 January 1973 the plaintiffs have been added to the pension rolls and paid pensions pursuant to the District Court order.

40. 353 F.Supp. at 741, *citing* Collins v. UMWA Welfare & Retirement Fund, 141 U.S.App.D.C. 387, 439 F.2d 494 (1970); Roark v. Boyle, 141 U.S.App.D.C. 390, 439 F.2d 497 (1970); DePaoli v. Boyle, 144 U.S.App.D.C. 364, 447 F.2d 334 (1971); Belcher v. Boyle, No. 71-1622 (D.C.Cir. 1972); Teston v. Carey, 150 U.S.App.D.C. 256, 464 F.2d 765 (1972); Gomez v. Boyle, Civil No. 170-71 (D.D.C., 24 Nov. 1971); Stewart v. UMWA Welfare & Retirement Fund of 1950, Civil No. 3792-70 (D.D.C., 8 Dec. 1971); Robbins v. UMWA Welfare & Retirement Fund of 1950, Civil No. 2218-67 (D.D.C., 23 June 1972); Maholtz v. Carey, Civil No. 1720-71 (D.D.C., 19 Dec. 1971); Foradori v. Carey, Civil No. 1960-71 (D.D.C., 19 Dec. 1971).

very face of the indenture, is to preserve the vitality of the fund and to effectively apply its worth to the benefit of as many intended employees as is economically possible." [41] We do not think that the relief afforded to plaintiffs-appellees will unduly interfere with the Trustees' discharge of this function. Estimates compiled by an actuary hired by the Fund indicate that retroactive payments to all miners who applied for pensions before 14 August 1970 and who were denied benefits on the basis of the signatory last employment requirement would amount to approximately $8.3 million through 31 December 1972. [42] This figure represents the upper limit on the retrospective costs imposed on the Fund by both the District Court decisions in this case and in the companion *Pete* case. [43] The Fund's 1971–72 Income Statement indicates that it had an unexpended balance as of 30 June 1972 of $78.8 million; [44] the unexpended balance as of 30 June 1973 was $83.5 million. [45] These figures suggest that the Fund is more than capable of absorbing out of unexpended reserves the retrospective costs imposed on it by these cases. [46]

The Trustees invoke the spectre of an extended strike that could curtail the Fund's intake of royalties from contributing operators and compel the Fund to dip into its reserves. They argue that those reserves should not be diminished by substantial retroactive payments to the class plaintiffs herein. However, the risk of a strike is one that should be borne equally by all pensioners as a potential burden on their *future* benefits. It should not be used as an excuse for denying qualified retirees benefits they have been wrongfully denied in the past.

The District Court's decision is affirmed insofar as it grants the plaintiffs-appellees retroactive relief. [47]

## V. *Total Signatory Service Requirement*

Section 302 of the Labor-Management Relations Act (Taft-Hartley Act) was enacted to prevent employers from attempting to dominate their employees' bargaining representatives by bribing unions or union officials. [48] Exceptions to the general prohibition

41. 133 U.S.App.D.C. 274, 278, 410 F.2d 262, 266 (1969).

42. Affidavit of Edward H. Friend, 13 March 1972, Joint App. at 30a.

43. The final figure should be lower since some of the putative class members in these cases may ultimately be excluded from the class recoveries because they failed to accumulate any significant amount of signatory service during their careers in the coal industry or because it is determined that they were denied benefits for some reason other than or in addition to the signatory last employment requirement.

44. Joint App. at 30a.

45. Affidavit of Thomas F. Ryan, Jr., 13 July 1973, in Pete v. UMWA Welfare & Retirement Fund, No. 73–1270 Supp.Joint App. at 25. Mr. Ryan estimated that the unexpended balance as of 30 June 1974 would be $47.9 million.

46. It is not clear whether the unexpended balance figures reflect the estimated retroactive costs of $12 million resulting from the *Blankenship* settlement approved 26 February 1973. *See* notes 25–26 *supra* and accompanying text. However, the balances are clearly sufficient to absorb this further cost even assuming it has not already been accounted for.

In the companion *Pete* case, the District Court explicitly found, "[I]t can hardly be said that the $3,151,435 [estimated] retroactive pensions for these plaintiffs could have any serious impact on the Fund presently or in the future." Pete v. UMWA Welfare & Retirement Fund, Memorandum and Order of 24 January 1974, Supp.Joint App. at 49, 55.

47. We also affirm the District Court's ruling that the estates of "miners whose pension applications were denied on the sole ground of failure to meet the signatory last employment requirement and who died prior to the effective pension enrollment date contained in the [District Court's order] . . . are entitled to receive pension installments accrued from the first of the month following dates of denial to the dates of death." 353 F.Supp. at 741–742.

48. 29 U.S.C. § 186 (1970).

against transfers of "money or other thing[s] of value" by employers to labor organizations are contained in section 302(c). Subsection (c)(5) provides:

The provisions of this section shall not be applicable . . . with respect to money or other thing of value paid to a trust fund established by such representative, for the sole and exclusive benefit of the employees of such employer, and their families and dependents (or of such employees, families, and dependents jointly with the employees of other employers making similar payments, and their families and dependents) . . . . [49]

For our purposes, the crucial phrase in this subsection is the one requiring that the trust fund to which an employer contributes be "for the sole and exclusive benefit of the employees of such employer, and their families and dependents . . . ." There is virtually nothing in the legislative history of Taft-Hartley to illuminate the exact purpose and meaning of this phrase.[50] In *Roark II*, we stated that the provision "requires that each pensioner have some history of contributory employment."[51] However, we failed to define specifically what minimum amount of signatory employment the provision requires.[52] None

---

49. 29 U.S.C. § 186(c)(5) (1970). This exception is subject to the following provisos: *Provided*, That (A) such payments are held in trust for the purpose of paying, either from principal or income or both, for the benefit of employees, their families and dependents, for medical or hospital care, pensions on retirement or death of employees, compensation for injuries or illness resulting from occupational activity or insurance to provide any of the foregoing, or unemployment benefits or life insurance, disability and sickness insurance or accident insurance; (B) the detailed basis on which such payments are to be made is specified in a written agreement with the employer, and employees and employers are equally represented in the administration of such fund, together with such neutral persons as the representatives of the employers and the representatives of employees may agree upon and in the event the employer and employee groups deadlock on the administration of such fund and there are no neutral persons empowered to break such deadlock, such agreement provides that the two groups shall agree on an impartial umpire to decide such dispute, or in event of their failure to agree within a reasonable length of time, an impartial umpire to decide such dispute shall, on petition of either group, be appointed by the district court of the United States for the district where the trust fund has its principal office and shall also contain provisions for an annual audit of the trust fund, a statement of the results of which shall be available for inspection by interested persons at the principal office of the trust fund and at such other places as may be designated in such written agreement; and (C) such payments as are intended to be used for the purpose of providing pensions or annuities for employees are made to a separate trust which provides that the funds held therein cannot be used for any purpose other than paying such pensions or annuities . . . .

50. The Senate added section 302(c)(5) as an amendment to H.R. 3020, and the House conferees ultimately accepted it. The conference report does little more than describe the provision. H.R.Rep.No.510, 80th Cong., 1st Sess. (1947). Prior to the bill's original passage in the House, Representative Landis offered an amendment that was very similar to the current section 302(c)(5). The amendment was rejected after some rather unenlightening debate. 93 Cong.Rec. 3562–70 (1947).

51. 141 U.S.App.D.C. at 394, 439 F.2d at 501.

52. We did make the statement quoted at note 11 *supra*. The Trustees argue that this statement reflects the court's conclusion that at least five years' total signatory employment is required as a prerequisite to pension eligibility under section 302(c)(5). We disagree. We think that the court was primarily concerned with eliminating the inequitable effects of a bare signatory last employment requirement, as reflected in the following passage:

[T]he Trustees have failed to explain why it is reasonable to award a pension to a man who has worked only one year in contributory employment and to deny one to a man who has worked 19 out of his 20 years in the coal industry in contributory employment.

141 U.S.App.D.C. at 396, 439 F.2d at 503. The five-year standard was proposed as a "validating context" for the signatory last employment requirement with the purpose of ameliorating the inequities identified by the court. We can hardly impute to the court

of our subsequent cases have clarified this problem, since in each case the aggrieved miner had accumulated a total amount of signatory service that would have been sufficient to qualify for a pension under even the most stringent eligibility requirement.[53]

Since neither the relevant statute nor our cases specify what total amount of signatory service should be required, the trustees of the UMWA Welfare and Retirement Fund and of other similar funds have some discretion in setting contributory service criteria. The Trustees have exercised that discretion with respect to future applications for benefits by promulgating Resolution No. 90, which requires five years' total signatory service for miners who apply before 31 December 1976, six years for those who apply between 1 January and 31 December 1977, and so on. However, we now hold in Part III *supra* that Resolution No. 63, not No. 90, governs the applications filed by members of the plaintiff class. Resolution No. 63 contains a one-year total signatory service requirement in the form of a requirement that the applicant have *retired immediately following one full year* of work for a signatory employer. The District Court concluded that in implementing Resolution No. 63,

> the Trustees themselves were under the apparent understanding that one year was sufficient under the Taft-Hartley Act in that the signatory last employment requirement applied to the last *full year* prior to retirement. The Trustees' error was not the requirement of one year's contributory employment, but the requirement that the one year of contributory service

be rendered the year immediately preceding retirement.[54]

The District Court thus thought it equitable to impose a requirement that in order to qualify for future pension benefits and retroactive relief, each member of the plaintiff class must demonstrate that he worked at least one year for a signatory employer *at any time* during his career. We affirm this exercise of equitable discretion by the District Court.

While we intimate no view on whether a one-year total signatory service requirement would be fair and equitable as a criterion of prospective application, we think such a requirement is appropriate in the peculiar circumstances of this case. We are dealing here with a limited number of retired miners who filed applications before 14 August 1970 and were denied benefits on the basis of the now extinct Resolution No. 63. Therefore, the impact of the one-year signatory service requirement approved here will be limited and entirely retrospective. Moreover, to impose a five-year signatory service requirement on the plaintiff class, as the Trustees suggest, would create the kind of inequity that *Roark II* sought to prevent. Hypothetically, there is a former miner, *A*, who retired after 1 February 1965 and applied for a pension on 1 January 1970. *A* had worked just one year for a signatory employer, but that year had been his last in the industry. Since *A* met all other eligibility requirements of Resolution No. 63, which was in effect when he applied, he was granted a pension and has been paid monthly benefits ever since. By contrast, *B* is a member of the plaintiff class who retired after 1

---

an intention to prescribe five years' total signatory service as an absolute requirement for pension eligibility in all circumstances, especially since the question of how much total signatory service is required by section 302(c)(5) was not at issue in *Roark II*. Like the District Court, we do "not interpret the [*Roark II*] language to mean that five years' contributory service is required where there is no signatory last employment

requirement coupled with it." 353 F.Supp. at 743.

53. The plaintiffs in *Roark II* had worked from 9 to 15 years for signatory employers. DePaoli had accumulated 8 years of signatory service. Teston had 11 to 12 years of signatory service to his credit.

54. 353 F.Supp. at 743–744 (emphasis original).

February 1965 and applied for a pension at the same time as *A*. *B* had worked for a signatory employer a total of four years and eleven months but retired from the industry while in the employ of a nonsignatory operator. Pursuant to the signatory last-year employment requirement of Resolution No. 63, the Trustees denied *B*'s pension application. Part III of this opinion declares the signatory last-year employment requirement invalid as applied to *B* and others similarly situated. However, if we were now to impose a requirement of five years' total signatory employment, *B*, with four years and eleven months of signatory service, would be denied retroactive relief and future pension benefits while *A*, with just one year of such service, would continue to be paid a pension. This is precisely the kind of inequity against which *Roark II* was directed.

We affirm the District Court's decision to require at least one year of signatory service as a condition to obtaining relief.

## VI. *Interest*

■ In its order of 19 January 1973 the District Court awarded members of the plaintiff class interest at six percent per annum on the total of the back pension payments that had accrued from the dates on which their applications had been denied to 31 December 1972.[55] However, the court reversed itself in its Supplemental Memorandum Opinion and Order of 6 February 1973 and relieved the Fund of any liability for interest.[56] We think that the plaintiffs-appellees are entitled to interest calculated in the manner described below.

This court has held that in an action in district court for recovery of a liqui-

dated indebtedness, the issue of whether the plaintiff has a right to prejudgment interest is governed by 15 D.C.Code § 108 (1973),[57] which provides:

> In an action in the United States District Court for the District of Columbia or the Superior Court of the District of Columbia to recover a liquidated debt on which interest is payable by contract or by law or usage the judgment for the plaintiff shall include interest on the principal debt from the time when it was due and payable, at the rate fixed by the contract, if any, until paid.

The District Court denied the plaintiffs-appellees interest in. part on the basis "that *total amounts* of accrued pension payments prior to January 1, 1973 cannot be considered *liquidated sums* due and payable *at the dates of pension denial.*"[58] While this statement is beyond dispute, it does not support the conclusion that the accrued pension payments are unliquidated liabilities of the Fund. As we held in Part III *supra*, each member of the plaintiff class acquired a vested right to receive monthly pension payments at the time the Trustees unlawfully denied his application. Thus, each time thereafter that the Trustees failed to send a plaintiff class member his monthly payment, the Fund became indebted to him for the amount of that payment. Each such debt is clearly liquidated in the sense that at the time it arose, it was an easily ascertainable sum certain.[59] Therefore, the question of whether the plaintiffs-appellees should receive interest on their accrued pension benefits is governed by 15 D.C.Code § 108.

Section 108 provides that "the judgment for the plaintiff *shall* include in-

---

55. Or the date of death, in the case of a deceased miner. Joint App. at 96a.

56. Joint App. at 112a, 113a.

57. Blustein v. Eugene Sobel Co., 105 U.S. App.D.C. 32, 263 F.2d 478 (1959) (applying the predecessor provision, 28 D.C.Code § 2707 (1951)).

58. Supplemental Memorandum Opinion (6 Feb. 1973), Joint App. at 112a (emphasis supplied).

59. *See* Blustein v. Eugene Sobel Co., 105 U.S.App.D.C. 32, 36, 263 F.2d 478, 482 (1959); Royce Chemical Co. v. Sharples Corp., 285 F.2d 183, 188 (2d Cir. 1960).

terest" if the action is "to recover a liquidated debt on which interest is payable by contract or by law or usage." Clearly, the Fund has no contractual obligation to pay interest to members of the plaintiff class. However, we have held that "law or usage" requires payment of interest in circumstances similar to those in the instant case. For example, in Mutual Benefit Health & Accident Association v. Messina,[60] we affirmed a District Court award of interest to an insured on the face amount of an insurance policy from the date on which the defendant insurer had wrongfully rejected the plaintiff's demands for the proceeds.[61] We think that the terms of 15 D.C.Code § 108 require that interest be paid to plaintiffs-appellees on their accrued pension benefits.

Even if section 108 were inapplicable here, we would find it difficult to affirm the District Court's denial of interest as an exercise of equitable discretion.[62] The Trustees have withheld pension payments from plaintiffs-appellees for several years in the face of decisions by this court which clearly indicated that such a course of action was wrongful. Meanwhile, the retired miners who are members of the plaintiff class have been denied the use of the pension payments to which they were clearly entitled. These circumstances cry out for the Fund to compensate plaintiffs-appellees for the time value of the wrongfully withheld pension benefits.

The District Court offered a further reason for its denial of interest:

[B]ecause the award of interest constitutes an additional burden on the assets of the Fund, and requires what would appear to be an inordinate expenditure of time and effort for computation on each individual claim, the Court has determined that the benefits to be derived from the payment of interest to the plaintiffs are outweighed by the importance of effectuating the payment of claims as quickly and efficiently as possible.[63]

The court's difficulty of computation rationale should be given little weight. An exhibit prepared by an actuary in connection with the companion *Pete* case sets out the formula and method for calculating interest on accrued pensions for the members of the *Pete* class from the dates monthly payments fell due through 31 December 1972.[64] Based on data indicating the date of pension denial for each class member, the monthly payment amounts in effect at various times, and the dates of death of deceased miners, the actuary calculated that interest on accrued pensions in *Pete* would total $1,077,436.00. Since a mathematical formula for calculating interest is available in this case, there is no warrant for denying interest to the plaintiffs-appellees on the basis of difficulty of computation. Moreover, a total interest figure comparable to the estimate made in the *Pete* case would hardly be unduly burdensome on the Fund's finances.

60. 121 U.S.App.D.C. 328, 350 F.2d 458 (1965), cert. denied, 383 U.S. 908, 86 S.Ct. 888, 15 L.Ed.2d 663 (1966).

61. Messina v. Mutual Benefit Health & Accident Ass'n, 228 F.Supp. 865 (D.D.C.1964) (applying the predecessor provision, 28 D. C.Code § 2707). In Blustein v. Eugene Sobel Co., 105 U.S.App.D.C. 32, 263 F.2d 478 (1959), we held that prejudgment interest was payable on a breach of warranty claim without expressly considering whether law or usage provided for such payment.

62. 15 D.C.Code § 109 (1973) provides that the jury or trial court is not precluded "from including interest as an element in the

damages awarded, if necessary to fully compensate the plaintiff." In Jackson County Bd. of Comm'rs v. United States, 308 U.S. 343, 352, 60 S.Ct. 285, 289, 84 L.Ed. 313 (1939), the Court stated that interest "is given in response to considerations of fairness [and] is denied when its exaction would be inequitable."

63. Supplemental Memorandum Opinion (6 Feb. 1973), Joint App. at 112a.

64. Letter from Ethel Censor Rubin, 9 August 1973, Pete v. UMWA Welfare & Retirement Fund of 1950 No. 73–1270, Supp. Joint App. at 46.

We therefore remand this aspect of the District Court's decision with instructions to award plaintiffs-appellees interest at six percent per annum [65] on accrued pension payments from the dates on which those payments fell due through the date on which the judgment in this case is satisfied.

## VII. *Attorneys' Fees*

In its opinion of 29 August 1973 [66] the District Court awarded attorneys' fees on the basis of a formula whose primary component was the number of hours logged by counsel. The court took the number of hours reported by Kiser class counsel, discounted them by a factor of thirty-five percent, and multiplied by an hourly rate of $40.00 to reach a basic compensation figure of $53,680.00. The court then added a premium equal to ten percent of the hourly compensation, or $5,368.00, plus $3,000.00 for all work by counsel subsequent to August 1973. This method yielded a total compensation figure for Kiser class counsel of $62,048.00. The attorneys for consolidated plaintiffs Moore, et al., received $3,640.00, which was calculated by discounting the total hours logged by thirty percent and multiplying by an hourly rate of $40.00. The court concluded that since counsel for intervenors Adkins, et al., "should have spent no more time than the *Moore* group attorney," [67] a fee equal to that received by Moore counsel, $3,640.00, would be appropriate.[68]

The fundamental principle that must guide our review of this aspect of the case is that we must pay considerable deference to the District Court's exercise of equitable discretion in setting the fees. As the First Circuit stated in Green v. Transitron Electronic Corp.: [69]

> The fixing of the amounts of attorneys' fees must, of necessity, be a matter within the discretion of the district court. The lower court "has far better means of knowing what is just and reasonable than an appellate court can have." Trustees v. Greenough, 105 U.S. 527, 537, 26 L.Ed. 1157 (1881). It is the lower court that has lived with the case and, therefore, is more alert to the merits of each request for counsel fees.[70]

Applying this standard of review, we must conclude that in most respects the District Court properly exercised its discretion.

The basic criteria for the District Court's determination of the appropriate fee-setting formula were those set out in the Manual for Complex Litigation [71] and the Code of Professional Responsibility.[72] The court emphasized that the case had been decided as a matter of law on a motion for summary judgment and that the principal issues were neither novel nor complex. The court minimized the net benefit conferred on members of the plaintiff class through counsel's efforts by noting that most class members could have obtained substantially similar benefits by opting out of this case and participating in the settlement agreement in Blankenship et al. v. UMWA Welfare and Retirement

65. The statutory rate under 28 D.C.Code § 3302 (1973).

66. Kiser v. Miller, 364 F.Supp. 1311 (D.D. C.).

67. 364 F.Supp. at 1320.

68. In addition, expenses were awarded as follows: $2,725.00 to Kiser class counsel; $891.32 to Moore counsel; $276.75 to Adkins counsel.

69. 326 F.2d 492 (1964).

70. *Id.* at 496. *See* 7A C. Wright & A. Miller, Federal Practice and Procedure 289 & n.51 (1972) and cases cited therein. In Freeman v. Ryan, 133 U.S.App.D.C. 1, 408 F.2d 1204 (1968), our decision to set attorneys' fees directly rather than remand to the district court was based on the peculiar circumstances of that case, including our assessment that we were "best situated to appraise the worth of counsel's service in providing assistance in the salient decision making." *Id.* at 3, 408 F.2d at 1206.

71. § 1.47 (3d ed.), published as supplement to C. Wright & A. Miller, Federal Practice and Procedure (1973) [hereinafter Manual].

72. DR § 2-106.

Fund of 1950 et al.[73] Therefore, despite the diligence of counsel and the success their efforts yielded, the court discounted the hours logged by the attorneys [74] and ordered compensation on an hourly basis plus a premium. We think that the District Court's evaluation of the relevant factors was reasonable.

We recognize, as did the District Court, that additional factors must be considered in fixing fees for attorneys in class actions.[75] In many cases, the efforts of class counsel result in the vindication of an important statutory or other public policy. Some class litigation establishes or advances legal principles for the benefit of a substantial segment of the consuming public or the citizenry. In such cases, it may be appropriate to reward class counsel for the benefits they have conferred on the public. While we do not downgrade the service the attorneys rendered here in asserting the pension rights of poor, retired mine workers, we cannot say that their efforts produced any significant public benefit in the sense described above.

Another concern when class attorneys' fees are at issue is that class litigation involves an element of risk: if the class plaintiffs do not prevail, their counsel may recover inadequate or no compensation. Thus, it is sound policy to grant class counsel some premium for their efforts as an incentive for other attorneys to undertake the risk of prosecuting class actions. As the District Court noted, however, the counsel in the present case assumed very little risk in pressing the claims of the class plaintiffs. The essential legal principles that control this case were established in *Roark II*, which was decided 14 days before the complaint was filed herein [76] and almost a year before the District Court certified this suit as a valid class action.[77] Therefore, the premium awarded by the District Court, ten percent of the total hourly compensation, reasonably reflects the magnitude of the risk assumed by class counsel.[78]

In determining attorneys' fees on an hourly basis, the District Court refused to give effect to consent forms mailed by counsel to class members on 22 January 1973, three days after entry of summary judgment for the plaintiff class. The consent forms bore the official caption of the case, informed the recipients of the District Court's 19 Janu-

73. *See* notes 25–26 *supra* and accompanying text.

74. The stated purpose of this discounting was "to compensate for the numerous telephone calls and conferences among attorneys, the time spent on the attorney fee question, and the discrepancies among the lawyers as to the time spent in court on hearings of various motions." 364 F.Supp. at 1318. Given the District Court's intimate familiarity with the developments at that level, we do not find the discounting of logged hours unreasonable. Note that despite its conclusion that the legal issues in this case are neither novel nor complex, the District Court did not attempt to second-guess class counsel on the amount of time counsel used in preparing the substance of plaintiffs' case.

75. *See* Manual, *supra* note 71, § 1.47.

76. The complaint in the companion *Pete* case was filed before *Roark II* was decided but after *Roark I* had declared the signatory last employment requirement presumptively invalid. The Pete class was certified on 30 September 1971, more than a year after *Roark II*.

77. By order dated 6 August 1971.

78. The extended length of this opinion reflects the complexity of the factual aspects of the instant case and does not indicate that the controlling legal principles have ever been in substantial doubt since *Roark II* was decided. When clas counsel undertook this case, there was little risk that any material factual issues would be resolved against them since the Trustees have never made any effort to contest plaintiffs' factual allegations. Indeed, most of the material facts in this litigation are incontrovertible. Our reasoning to this point applies with equal force to the counsel for intervenors Adkins, et al. and consolidated plaintiffs Moore, et al. It does not appear that the District Court acted unreasonably when it awarded the same fee to Adkins counsel as it had determined appropriate for Moore counsel. *See* text accompanying notes 67–68 *supra*.

ary 1973 opinion, advised class members that "attorneys for the Class, will petition the Court for an allowance of attorney fees in an amount equal to one-third of [accrued] pension benefits," and solicited the recipients' consents to the court's allowance of fees on the basis described.[79] Signatures on these consent forms were obtained from 401 of the class members.

We agree with the District Court that fee agreements of this nature must be subjected to close judicial scrutiny under equitable principles. As we stated in Spilker v. Hankin:

Fee contracts between attorney and client are a subject of special interest and concern to the courts. They are not to be enforced upon the same basis as ordinary commercial contracts. *Especially is this true where, as in this case, a contract beneficial to the attorney is executed long after the attorney-client relationship has commenced,* when the position of trust is well established, and the litigation involved is reaching its culmination. "In some jurisdictions it has been held that such agreements are void. In other states contracts of such character are held to be affirmatively invalid on the ground of fraud, and the burden is on the attorney to show the fairness of the transaction in that the compensation provided for does not exceed a reasonable compensation for the services rendered or to be rendered." In re Howell, 215 N.Y. 466, 109 N.E. 572, 574. Many courts, in-

cluding the courts of this jurisdiction, have gone so far as to say that they are attended by a presumption of invalidity and overreaching.[80]

In the case at bar, the District Court found that members of the plaintiff class "lack the sophistication, experience and education to act understandingly and deal with their attorneys on an equal basis at arms length." [81] The court further determined that "the amounts of the contingent fee contracts are excessive in light of the actual legal services necessary to succeed in this public interest suit." [82] These findings, plus the fact that class counsel had solicited the fee agreement without court approval and after entry of summary judgment for the class, led the court to conclude that it would be inequitable to give effect to the agreements.[83] We find this decision reasonable and therefore affirm.

The District Court also refused to enforce contingent fee agreements obtained by counsel from consolidated plaintiffs Moore, et al., and intervenors Adkins, et al.[84] Since the relevant circumstances underlying the Moore and Adkins agreements did not differ materially from those underlying the Kiser consents, we affirm this decision of the District Court as well.

 The single aspect of the District Court's decision on attorneys' fees with which we cannot agree is the award of $3,000.00 to Kiser class counsel for all work to be performed after the

---

79. Supp. Joint App. at 36sa.

80. 88 U.S.App.D.C. 206, 210, 188 F.2d 35, 39 (1951) (emphasis supplied).

81. 364 F.Supp. at 1319.

82. *Ibid.*

83. Support for the District Court's conclusion may be found in the Manual for Complex Litigation, which identifies as a potential abuse of the class action device "solicitation of funds and agreements to pay fees and expenses from potential and actual class members who are not formal parties to the class action." Manual, *supra* note 71, § 1.-

41. To prevent such abuses, the Manual recommends

that each court adopt a local rule forbidding *unapproved* direct or indirect written and oral communications by formal parties or their counsel with potential and actual class members, who are not formal parties, provided that such proposed written communications submitted to and approved by order of court may be distributed to the parties or parties designated or described in the court order of approval.

*Ibid.* (emphasis original).

84. For reasons set out at 364 F.Supp. at 1319–1320.

court's order of 29 August 1973. The court attempted to justify this award with the following statement:

The work remaining in the case consists of the argument in the Court of Appeals (briefs already filed) and the resolution of the minor dispute as to whether the 310 miners or their estates are valid members of the class. In this regard the United Mine Workers of America and the Defendant Trustees were ordered on August 1, 1973 to go into the field and assist these people in the preparation and filing of applications to determine whether they were valid members of this class and thus entitled to the benefits (Tr. 51–52). This directive eliminates the need for extended future services on the part of counsel.[85]

While we do not directly contest the validity of these findings, we hold that the court's ultimate determination on fees for prospective work cannot be sustained. Any flat figure, including the $3,000.00 chosen by the District Court, is at best a mere approximation of the value of counsel's services since August 1973. The fact that the Trustees vigorously contested the merits of this case on appeal undoubtedly compelled class counsel to log a significant number of hours in preparation, even after briefing had been completed. Moreover, despite the court-ordered efforts of the Fund and Trustees to ensure that all class members are found and enrolled, class counsel had and has a responsibility to oversee the process of finally determining the class membership. Therefore, we must remand the question of attorneys' fees for a determination of the value of the services rendered by class counsel during the period between August 1973 and the termination of this litigation.[86] In making this determination, the court should consider the final time logs submitted by counsel and exercise its discretion in deciding whether to discount the time logged and what formula to apply in calculating the fees.

■ Finally, we think the District Court was justified in shifting liability for plaintiffs' attorneys' fees to the defendants. The established exceptions to the general "American Rule" that attorneys' fees are not recoverable by a successful litigant were most recently articulated by the Supreme Court in F. D. Rich Co. v. Industrial Lumber Co.[87]:

We have long recognized that attorneys' fees may be awarded to a successful party when his opponent has acted in bad faith, vexatiously, wantonly, or for oppressive reasons, or where a successful litigant has conferred a substantial benefit on a class of persons and the court's shifting of fees operates to spread the cost proportionately among the members of the benefitted class.[88]

The District Court cogently brought the instant case within both exceptions. First, although the Trustees are before the court in their fiduciary capacities and thus bear no personal liability for the shifted attorneys' fees, the District Court was not unwarranted in concluding:

Justice requires that the Defendants pay the costs and attorney's fees incurred in this suit to compel the Defendants to discontinue their protracted discriminatory conduct and breach of fiduciary duty.[89]

More compelling was the court's finding that it is appropriate for the Fund to bear the cost of plaintiffs' legal fees since "the entire Fund benefited from this suit with the prevention of general fiduciary abuse and improvement of the

---

85. 364 F.Supp. at 1317.

86. Payment of retroactive benefits to class members under the terms of the District Court's order, as affirmed herein, should of course proceed immediately and not be delayed pending this determination.

87. 417 U.S. 116, 94 S.Ct. 2157, 40 L.Ed.2d 703 (1974).

88. *Id.* at 130, 94 S.Ct. at 2165 (footnotes omitted).

89. 364 F.Supp. at 1320.

institutional functioning of the Fund as an entity." [90] We therefore affirm the District Court's decision to tax plaintiffs' attorneys' fees to defendants.

### VIII. *Conclusion*

We affirm the District Court's disposition of the substantive issues. Members of the plaintiff class are therefore entitled to immediate relief under the terms of the District Court's order. We reverse the District Court's decision that plaintiffs-appellees are not entitled to interest and remand for payment of interest in accordance with Part VI of this opinion. Finally, we affirm the court's award of attorneys' fees and taxation of those fees against defendants-appellants, except that we remand to the court for recalculation of post-August 1973 compensation for class attorneys.

Affirmed in part; reversed and remanded in part.

### APPENDIX

#### RESOLUTION NO. 63

SEVENTY–EIGHTH MEETING OF THE BOARD OF TRUSTEES OF THE UNITED MINE WORKERS OF AMERICA WELFARE AND RETIREMENT FUND OF 1950, JANUARY 4, 1965

\* \* \* \* \* \*

I. *Eligibility*

 A. An applicant who subsequent to February 1, 1965 permanently ceases work in the bituminous coal industry as an employee of an employer signatory to the National Bituminous Coal Wage Agreement of 1950, as amended, shall be eligible for a pension if he has:

 1. Attained the age of fifty-five (55) years or over at the date of his application for pension.

 2. Completed twenty (20) years' service in the coal industry in the United States, as described in paragraph II A hereof.

 3. Permanently ceased work in the coal industry immediately following regular employment for a period of at least one (1) full year as an employee in a classified job for an employer signatory to the National Bituminous Coal Wage Agreement, as defined in paragraphs II B hereof.

 B. An applicant who, prior to February 1, 1965, had permanently ceased work in the bituminous coal industry, as an employee of an employer signatory to the National Bituminous Coal Wage Agreement of 1950, as amended, shall be eligible for a pension if he has:

 1. Attained the age of fifty-five (55) years or over at the date of his application for pension.

 2. Completed twenty (20) years' service in the coal industry as described in paragraph II A hereof, in the United States, within the thirty (30) years' period immediately preceding the date his application for pension is received at the office of the Trust Fund.

 3. Permanently ceased work in the bituminous coal industry after May 28, 1946, following regular employment as an employee in a classified job for an employer signatory to the National Bituminous Coal Wage Agreement, and having been regularly employed in a classified job in the coal industry immediately preceding May 29, 1946.

 C. An applicant who could have qualified for a pension under paragraph I B hereof, had he not worked beyond February 1, 1965, or an applicant who at any time

---

90. *Id.* at 1321, *citing* Mills v. Electric Auto-Lite Co., 396 U.S. 375, 90 S.Ct. 616, 24 L. Ed.2d 593 (1970).

after February 1, 1965, could have permanently ceased work and qualified for a pension under Paragraph I A hereof, at age fifty-five (55) or over but continued to work in the coal industry, shall not be required to work one (1) full year immediately preceding permanent cessation of work so long as his only subsequent employment in the coal industry is as an employee in a classified job for an employer signatory to the National Bituminous Coal Wage Agreement.

## RESOLUTION NO. 83
ONE HUNDRED THIRD MEETING OF THE BOARD OF TRUSTEES OF THE UNITED MINE WORKERS OF AMERICA WELFARE AND RETIREMENT FUND OF 1950, JANUARY 14, 1971

\* \* \* \* \* \*

WHEREAS, it is the desire, intent and purpose of the Trustees as one of the eligibility requirements for pensions to require signatory employment of significant and meaningful duration so as to provide on an equitable basis an inducement to seasoned and experienced employees of signatory operators to remain with their respective employers, or other signatory employers, during their productive years, thus making more possible and probable a stable and continuing work force for contributing employers and a uniform but liberal eligibility requirement applicable equally to all beneficiaries on as equitable a basis as the peculiarities and the needs of the bituminous coal industry may require and the financial stability and integrity of the Fund may justify and allow;

\* \* \* \* \* \*

I. *Eligibility*

 A. An applicant who, on or after February 1, 1965, ceases work in the bituminous coal industry as an employee of an employer signatory to the bituminous coal wage agreement then in effect, shall be eligible for a pension if he has:

 1. Attained the age of fifty-five (55) years or over at the date of his application for pension.

 2. Completed twenty (20) years' service in the coal industry in the United States, a "year of service" being as defined in paragraph II A hereof, provided, however, that as a part of such twenty (20) years' service, an applicant whose application is received in the office of the Fund on April 1, 1971, or thereafter, must have worked, after May 28, 1946, the following minimum years of signatory service, a "year of signatory service" being as defined in paragraph II C hereof:

| APPLICATIONS RECEIVED DURING THE PERIOD | YEARS OF SIGNATORY SERVICE REQUIRED |
| --- | --- |
| April 1, 1971, to December 31, 1976 | Five (5) years |
| January 1, 1977, to December 31, 1977 | Six (6) years |
| January 1, 1978, to December 31, 1978 | Seven (7) years |
| January 1, 1979, to December 31, 1979 | Eight (8) years |
| January 1, 1980, to December 31, 1980 | Nine (9) years |
| January 1, 1981, and thereafter | Ten (10) years |

 3. Ceased work in the coal industry immediately following regular employment for a period of at least "one (1) full year" as defined in paragraph II B hereof, as an employee in a classified job for an employer signatory to the bituminous coal wage agreement then in effect.

 B. An applicant who, prior to February 1, 1965, had ceased work in the bituminous coal industry as an employee of an employer signatory to the National Bitumi-

nous Coal Wage Agreement of 1950, as amended, shall be eligible for a pension if he has:

1. Attained the age of fifty-five (55) years or over at the date of his application for pension.

2. Completed twenty (20) years' service in the coal industry in the United States, a "year of service" being as defined in paragraph II A hereof, within the thirty (30) years' period immediately preceding the date his application for pension is received at the office of the Trust Fund, provided, however, that as a part of such twenty (20) years' service, an applicant must have worked, after May 28, 1946, a minimum of five (5) years' signatory service, a "year of signatory service" being as defined in paragraph II C hereof, provided further that an applicant who attains age fifty-five (55) after the effective date of this Resolution and has worked after May 28, 1946, a minimum of five (5) years' signatory service, but delays filing an application for pension, shall be deemed to meet the twenty (20) years out of thirty (30) years' requirement if he had completed twenty (20) years of classified service within the thirty (30) years' period immediately preceding applicant's attainment of age fifty-five (55).

3. Ceased work in the bituminous coal industry following regular employment as an employee in a classified job for an employer signatory to the bituminous coal wage agreement then in effect.

C. An applicant who could have met the requirements of paragraphs I B 2 and I B 3 hereof, had he not worked beyond February 1, 1965, or an applicant who at any time after February 1, 1965, could have ceased work and met the requirements of paragraphs I A 2 and I A 3 hereof, but continued to work in the coal industry, shall not be required to work "one (1) full year" as defined in paragraph II B hereof, immediately preceding cessation of work, provided applicant's only subsequent employment in the coal industry is as an employee in a classified job for an employer signatory to the bituminous coal wage agreement then in effect.

\* \* \* \* \* \*

VI. *Effective Date*

A. Applications received in the office of the Trust Fund on April 1, 1971, and thereafter, shall be subject to, and governed by, the terms of this Resolution.

B. Applications received in the office of the Trust Fund before April 1, 1971, shall be subject to, and governed by, the regulations in effect on the date of receipt of such applications.

C. Applications received in the office of the Trust Fund during the period August 14, 1970, through March 31, 1971, which do not satisfy the requirements of regulations in effect during that period, shall be reviewed subject to the terms of this Resolution.

### RESOLUTION NO. 89

ONE HUNDRED SEVENTEENTH MEETING OF THE BOARD OF TRUSTEES OF THE UNITED MINE WORKERS OF AMERICA WELFARE AND RETIREMENT FUND OF 1950, MARCH 2, 1972

WHEREAS, In adopting Resolution No. 83 on January 14, 1971, effective April 1, 1971, it was the desire and intention of the Trustees to comply with the decisions and opinions of the United

States Court of Appeals for the District of Columbia Circuit, and it is still the desire and intention of the Trustees to comply with the decisions and opinions of that Court; and,

WHEREAS, Resolution No. 83 was retroactively effective only as to applications received in the office of the Trust Fund during the period August 14, 1970, through March 31, 1971, which did not satisfy the requirements of regulations in effect during that period, and it is the desire of the Trustees that eligibility requirements of Resolution No. 83 be applicable to applications received prior to August 14, 1970, which were denied because the applicant failed to prove he had ceased work in the bituminous coal industry following employment in a classified job for an employer signatory to the bituminous coal wage agreement, a requirement then in effect;

NOW, THEREFORE, BE IT RE-SOLVED, That Resolution No. 83 as heretofore adopted by the Trustees, is hereby retroactively amended, effective April 1, 1971, by inserting the following:

VI. *Effective Date*

&ast; &ast; &ast; &ast; &ast; &ast;

D. Applications received in the office of the Trust Fund prior to August 14, 1970, and denied because the applicant failed to prove that he had ceased work in the bituminous coal industry immediately following regular employment for a period of at least one (1) full year as an employee in a classified job for an employer signatory to the bituminous coal wage agreement then in effect, or because the applicant failed to prove that he had ceased work in the bituminous coal industry following regular employment as an employee in a classified job for an employer signatory to the bituminous coal wage

agreement then in effect, shall, upon presentation for reconsideration, be reviewed subject to the requirements of paragraphs I.A. 2., and I.A.3., or paragraphs I.B. 2., and I.B.3., of this Resolution, whichever are applicable.

BE IT FURTHER RESOLVED, That in all other respects Resolution No. 83 remains unchanged and in full force and effect.

BE IT FURTHER RESOLVED, That the Director is hereby authorized and directed to activate this Resolution in accordance with its terms and conditions and is empowered to do all things, to perform all necessary acts, and to require the submission of evidence in order to effectuate the purpose of this Resolution.

## RESOLUTION NO. 90

ONE HUNDRED TWENTY-SIXTH MEETING OF THE BOARD OF TRUSTEES OF THE UNITED MINE WORKERS OF AMERICA WELFARE AND RETIREMENT FUND OF 1950, OCTOBER 18, 1972

&ast; &ast; &ast; &ast; &ast; &ast;

BE IT FURTHER RESOLVED, That effective November 1, 1972, the following regulations shall govern the payment of pensions of $150.00 per month to employees of employers signatory to the National Bituminous Coal Wage Agreement of 1950, and the amendments thereto, the National Bituminous Coal Wage Agreement of 1968, the National Bituminous Coal Wage Agreement of 1971, and the related sub-bituminous coal wage agreements, other than those exempted from said agreements, and shall be subject to amendment, revocation and revision at the discretion of the Trustees.

I. *Eligibility*

A. An applicant who ceased work in the bituminous coal industry shall

be eligible for a pension if he has:

1. Attained the age of fifty-five (55) years or over at the date of his application for pension.

2. Completed twenty (20) years' service in the coal industry in the United States, a "year of service" being as defined in paragraph II A hereof, provided, however, that as a part of such twenty (20) years' service the applicant must have worked, after May 28, 1946, the following minimum years of signatory service, a "year of signatory service" being as defined in paragraph II B hereof:

| APPLICATIONS RECEIVED DURING THE PERIOD | YEARS OF SIGNATORY SERVICE REQUIRED |
|---|---|
| Prior to December 31, 1976 | Five (5) years |
| January 1, 1977, to December 31, 1977 | Six (6) years |
| January 1, 1978, to December 31, 1978 | Seven (7) years |
| January 1, 1979, to December 31, 1979 | Eight (8) years |
| January 1, 1980, to December 31, 1980 | Nine (9) years |
| January 1, 1981, and thereafter | Ten (10) years |

Employment in the coal industry after April 1, 1971, will be credited as service required for pension eligibility as provided in paragraphs I A 2 and I A 3 hereof only if it is performed for an employer signatory to the bituminous coal wage agreement then in effect.

3. Worked as an employee in a classified job for an employer signatory to the bituminous coal wage agreement then in effect, during the five (5) year period immediately preceding last employment in the bituminous coal industry, based on his total number of years of signatory service completed since May 1946, a "year of signatory service" being

as defined in paragraph II B hereof, as follows:

| Years of Credited Signatory Service Completed Since May 1946 | Credited Signatory Service Required Immediately Prior to Ceasing Work in the Coal Industry |
|---|---|
| 5 through 9 | 3 out of last 5 years |
| 10 through 14 | 2 out of last 5 years |
| 15 through 19 | 1 out of last 5 years |
| 20 and over | 0 out of last 5 years |

B. Any miner, who otherwise qualifies for a pension pursuant to sections I A 2 and I A 3 hereof at the time he is fifty-five years of age or over, may thereafter work in any job for an employer signatory to the bituminous coal wage agreement then in effect and qualify for a pension when he ceases such work.

C. Any miner who has completed at least 20 years of credited signatory employment may thereafter work in any job in the bituminous coal industry and qualify for a pension when he attains fifty-five years of age or over and ceases working in the bituminous coal industry.

D. Any miner who, based on his then current employment record, meets the requirement of paragraphs I A 2 and I A 3 hereof, may thereafter work in the coal industry and shall not be required to again meet the requirements of paragraph I A 3, provided that all such work was as an employee in a classified job for an employer signatory to the bituminous coal wage agreement then in effect.

\* \* \* \* \* \*

VI. *Effective Date*

A. Applications received in the office of the Trust Fund on November 1, 1972, and thereafter, shall be subject to, and governed by, the terms of this Resolution; Provided however, that applica-

tions received between November 1, 1972 and January 1, 1973 may be approved if the terms of Resolution 83 are met.

B. Applications received in the office of the Trust Fund prior to November 1, 1972, which failed to satisfy the requirements of regulations then in effect, shall be reviewed subject to the terms of this Resolution, and if it is found the applicant meets the requirements of this Resolution, payment shall be authorized, but no payment shall be authorized for the period prior to the effective date of this Resolution.

EDWARDS,* Circuit Judge (dissenting on one issue):

I regret to find myself in disagreement as to what appears to me to be the principal issue involved in this appeal. I recognize this court's long encounter with the problems posed by that strange but lasting John L. Lewis[1] creation known as the United Mine Workers of America Welfare and Retirement Fund. Additionally, I respect the well-written majority opinion of the court. My Brother Wilkey has woven his argument skillfully from the warp of prior decisions of this court[2] and the woof of responding Retirement Board resolutions.

Unfortunately, the result in one important respect appears to me to be completely wrong in both law and equity, and I am compelled to dissent. This case (and its companion case, Pete v. UMWA Welfare and Retirement Fund of 1950, —— U.S.App.D.C. ——, 517 F.2d 1267 No. 73–1270) will occasion the UMWA Welfare and Retirement Fund to pay lifetime pensions to miners whose coal digging contribution to the Retirement Fund is as little as one year. I doubt that there is any precedent in history for judicial imposition of such private philanthropy. Of course, I do not doubt the need of the individuals who will receive these contributions. But this is not a case involving public financing of miner's welfare. It is, on the contrary, a wholly private fund created by the UMWA and the mine owners, members of the Bituminous Coal Operators Association, who signed labor contracts with the union. The Fund was created to provide benefits (primarily pensions) for employees under those labor-management contracts. Under this pension every retired miner who is found eligible is granted the same pension as is every other pensioner—regardless of the extent of his contribution to the fund and regardless of his family need. Although this fund deals in many millions of dollars each year, its obligations are such as really to make its pensions represent equally shared poverty.

The highest pension the miners in signatory mines have ever received is $150 a month for support of themselves and their families. The orders of this court will not increase the amount available to the Retirement Fund for distribution as pensions. It will simply decrease the amount available to all pensioned miners (present and future) by increasing the

---

* Sitting by designation pursuant to 28 U.S.C. § 291(a).

1. Shakespeare might have been talking about the former UMWA president when he said, "The evil that men do lives after them,/The good is oft interred with their bones." W. Shakespeare, *Julius Caesar*, Act III, sc 2, *ll.* 80–81.

2. Danti v. Lewis, 114 U.S.App.D.C. 105, 312 F.2d 345 (1962); Roark v. Lewis, 130 U.S. App.D.C. 360, 401 F.2d 425 (1968) (*Roark I*); Collins v. UMWA Welfare and Retirement Fund of 1950, 141 U.S.App.D.C. 387, 439 F.2d 494 (1970); Roark v. Boyle, 141 U.S.App.D.C. 390, 439 F.2d 497 (1970) (*Roark II*); DePaoli v. Boyle, 144 U.S. App.D.C. 364, 447 F.2d 334 (1971); Belcher v. Boyle, 82 L.R.R.M. 2435 (D.D.C.1971), aff'd sub nom. Belcher v. Carey, No. 71–1622 (D.C.Cir. 1972) (unreported); Teston v. Carey, 150 U.S.App.D.C. 256, 464 F.2d 765 (1972).

total number of pensioners who will share the funds available.[3]

The record in this case discloses no reason in law or equity why mine owners who have signed union agreements and joined together to finance this fund should be called upon against their will to pay full lifetime pensions to retirees who spent 19⁄20ths of their productive work lives in the nonunion mines of their competitors. Nor does the record disclose any reason why miners whose collective efforts created this fund and whose work in the mines dug the coal which financed it should have their present and future inadequate pensions reduced by full pensions for other miners whose contributions were only the most minimal.

My Brother Wilkey's opinion argues that succeeding D. C. Circuit cases and UMWA Welfare and Retirement Fund resolutions inexorably require this result. This result, however, offends established principles of equity, a controlling federal statute, and the controlling case law of this circuit.

The United Mine Workers of America Welfare and Retirement Fund was a creation of collective bargaining. It was established by the National Bituminous Coal Wage Agreement of 1950 under the terms of Section 302(c)(5) of the Labor-Management Relations Act of 1947, codified at 29 U.S.C. § 186(c)(5) (1970). The funds for the pension trust are generated by a payment of a contractually determined amount per ton of coal mined by each producer who is signatory to the National Bituminous Coal Wage Agreement. (Under the NBCW Agreement of 1950, the figure was thirty cents per ton.) The Fund is administered by a Board of Trustees consisting of an equal number of representatives of the UMW and the Bituminous Coal Operators Association, who choose an impartial third member. The trustees "have full authority with respect to coverage and eligibility." As noted above, the trustees have seen fit to pay all pensioners whom they accept as eligible, the same pension in dollar amount. (During the years in question here the highest pension ever paid is the present $150 per month.)

The National Bituminous Coal Wage Agreement of 1950 established the purposes of the Fund in the language of an irrevocable trust:

"It is agreed that this Fund is an irrevocable trust created pursuant to Section 302(c) of the 'Labor-Management Relations Act, 1947,' and shall endure as long as the purposes for its creation shall exist. Said purposes shall be to make payments from principal or income or both, of (1) benefits to employees of said Operators, their families and dependents for medical or hospital care, pensions on retirement or death of employees, compensation for injuries or illness resulting from occupational activity or insurance to provide any of the foregoing, or life insurance, disability and sickness insurance or accident insurance; (2) benefits with respect to wage loss not otherwise compensated for at all or adequately by tax supported agencies created by federal or State law; (3) benefits on account of sickness, temporary disability, permanent disability, death or retirement; (4) benefits for any and all other purposes which may be specified, provided for or permitted in Section 302(c) of the 'Labor-Management Relations Act, 1947,' as agreed upon from time to time by the Trustees in-

3. The record shows that only a relatively few of the claimants in this appeal are seeking pensions with less than five years of signatory employment. Nevertheless, as we will see, how and under what circumstances a pension vests is one of the most important questions in pension law. Additionally, under the majority holding, the court must anticipate a class suit on behalf of all miners, dead or alive, who could and would have filed claims had they known that such minimal signatory employment could justify a pension, seeking waiver of their failure to file promptly.

cluding the making of any or all of the foregoing benefits applicable to the individual members of the United Mine Workers of America and their families and dependents, and to employees of the Operators other than those exempted from this Agreement; and (5) benefits for all other related welfare purposes, as may be determined by the Trustees within the scope of the provisions of the aforesaid 'Labor-Management Relations Act, 1947.' Subject to the stated purposes of this Fund, the Trustees shall have full authority, within the terms and provisions of the 'Labor-Management Relations Act, 1947,' and other applicable law, with respect to questions of coverage and eligibility, priorities among classes of benefits, amounts of benefits, methods of providing or arranging for provisions for benefits, investment of trust funds, and all other related matters." Joint Appendix at 32–33, Roark v. Boyle, 141 U.S.App.D.C. 390, 439 F.2d 497 (1970).

The critical language of this trust indenture establishes as its first purpose providing "benefits to employees of said Operators [previously defined as Operators who signed the National Bituminous Coal Wage Agreement] for pensions on retirement or death of employees." It is perhaps the most fundamental rule in the law of trusts that the trustees owe absolute loyalty to the purposes of the trust as declared by the settlors.

Thus concerning beneficiaries of a trust, the Restatement of the Law of Trusts provides:

"§ 226. *Liability for Payments or Conveyances Made to Persons Other Than the Beneficiary*

If by the terms of the trust it is the duty of the trustee to pay or convey the trust property or any part thereof to a beneficiary, he is liable if he pays or conveys to a person who is neither the beneficiary nor one to whom the beneficiary or the court has authorized him to make such payment or conveyance." Restatement (Second) of Trusts, § 226 (1957).

And Scott on Trusts elaborates:

"§ 226. *Liability for Payments or conveyances made to persons other than the beneficiary.* Where the trustee makes payment of trust funds or conveys trust property to a person other than the beneficiary entitled to receive the money or other property, he is liable to the beneficiary, unless the payment or conveyance was authorized by a proper court. This is true, of course, where the trustee intentionally or negligently makes a payment or conveyance to the wrong person. It is also true where he reasonably believes that the person to whom he makes the payment or conveyance is entitled thereto. Thus the trustee is liable if he makes payment to the wrong person as a result of a mistake of law or an erroneous interpretation of the trust instrument, even though the mistake is a reasonable one." 2 A. W. Scott, The Law of Trusts § 226, at 1647–48 (2d ed. 1956). (Footnotes omitted.)

When in the Labor-Management Relations Act of 1947 (Taft-Hartley Act), 29 U.S.C. § 141 *et seq.* (1970), the Congress of the United States decided to legislate on the question of pensions arising out of collective bargaining, it did so in language drawn from the underlying principles of trust law outlined above.

The controlling statute provides:

"(c) The provisions of this section shall not be applicable . . .

"(5) with respect to money or other thing of value paid to a trust fund established by such representative, *for the sole and exclusive benefit of the employees of such employer, and their families and dependents* (or of such employees, families,

and dependents jointly with the employees of other employers making similar payments, and their families and dependents): *Provided,* That (A) such payments are held in trust for the purpose of paying, either from principal or income or both, for the benefit of employees, their families and dependents, for medical or hospital care, pensions on retirement or death of employees, compensation for injuries or illness resulting from occupational activity or insurance to provide any of the foregoing, or unemployment benefits or life insurance, disability and sickness insurance, or accident insurance; (B) the detailed basis on which such payments are to be made is specified in a written agreement with the employer, and employees and employers are equally represented in the administration of such fund, together with such neutral persons as the representatives of the employers and the representatives of employees may agree upon and in the event the employer and employee groups deadlock on the administration of such fund and there are no neutral persons empowered to break such deadlock, such agreement provides that the two groups shall agree on an impartial umpire to decide such dispute, or in event of their failure to agree within a reasonable length of time, an impartial umpire to decide such dispute shall, on petition of either group, be appointed by the district court of the United States for the district where the trust fund has its principal office, and shall also contain provisions for an annual audit of the trust fund, a statement of the results of which shall be available for inspection by interested persons at the principal office of the trust fund and at such other places as may be designated in such written agreement; and (C) such payments as are intended to be used for the purpose of providing pensions or annuities for employees are made to a separate trust which provides that the funds held therein cannot be used for any purpose other than paying such pensions or annuities; . . . . ” 29 U.S.C. § 186(c)(5) (1970). (Emphasis added.)

In prior cases of this court we find recognition of an adherence to these principles. Thus the court rejected the Retirement Board's requirement that no miner could be eligible for a pension unless he had worked the last year prior to retirement in signatory mining. But it did so in cases where the three named plaintiffs had 11 years, 9 years and 14 years of signatory employment. Roark v. Lewis, 130 U.S.App.D.C. 360, 361, 401 F.2d 425, 426 (1968) (*Roark I*).

In what appears to me to be the controlling case (*Roark II*), Judge Leventhal's opinion for the court said:

"What is arbitrary, however, is a plan that puts a miner, leaving signatory employment through no fault of his own, to such a hard choice, all in the interest of employer loyalty and economic survival of a pension system, when the plan has not at least taken the step of furthering both these interests with an eligibility condition requiring substantial contributory employment. In a plan with flat equal pensions, eligibility requirements rationally calculated to reward employer loyalty cannot depend on the single fact of employment by a contributing employer during the year immediately preceding retirement. They must also focus a significant period of contributory employment." Roark v. Boyle, 141 U.S.App.D.C. 390, 400, 439 F.2d 497, 507 (1970).

The court's opinion continued:

"This defect mars the eligibility requirements applied to deny a pension to appellants. The Trustees' contention that the signatory last employment requirement is a rational 'minimum' requirement of contributory em-

ployment is not persuasive. It is a strange 'minimum' that can be satisfied by someone who has worked one year for a contributing employer and yet be deemed unsatisfied by a man who has worked for contributing employers for 19 of his 20 years in the coal industry." *Ibid.*

Regrettably, it seems to me that the court in our instant case now stands this logic on its head. Out of concern that a miner who worked 19 of 20 years in the mines in signatory employment should be excluded from a pension, we now award pensions to miners who worked 19 out of 20 years in nonsignatory and competitive mines. And to do so, we either disregard the *Roark II* requirement of a "significant period of contributory employment," or, astonishingly, we are defining one year out of twenty as "a significant period of contributory employment."

Under the instructions of this court the UMWA Retirement Board has now established five years as its definition of "a significant period of contributory employment." I do not see how the District Judge or we can properly hold that the five year period is "arbitrary and unreasonable." Indeed, this court in *Roark II* appears to me to have directed the Retirement Board to accept just such a standard. After reviewing private pension plans under collective bargaining, this court's final holding in *Roark II* was:

"[W]e conclude that a requirement of signatory last employment can be a valid eligibility requirement only if it is in context of a plan that conditions eligibility on a period of contributory employment that is of sufficiently significant duration to warrant eligibility for a flat pension. *A period less than five years would manifestly not be sufficient under this standard.*" Roark v. Boyle, 141 U.S.App.D.C. 390, 401, 439 F.2d 497, 508 (1970). (Emphasis added.)

As this dissent is being drafted, the United States Congress is considering a bill which would seek to spell out public policy concerning pensions more fully than has yet been done. A noncontroversial aspect of the bill now being considered by the House and Senate conferees provides as follows:

"SEC. 411. MINIMUM STANDARDS RELATING TO VESTING.

"(a) GENERAL RULE.—Except as provided in subsection (c), a trust shall not constitute a qualified trust under section 401(a) unless the plan of which such trust is a part satisfies the requirements of paragraphs (1) and (2).

"(1) EMPLOYEE CONTRIBUTIONS.—A plan satisfies the requirements of this paragraph if, under the plan, an employee's rights in his accrued benefit derived from his own contributions are nonforfeitable.

"(2) EMPLOYER CONTRIBUTIONS.—

"(A) NONFORFEITABLE PERCENTAGE.—A plan satisfies the requirements of this paragraph if, under the plan, after 5 years of service (3 of which are consecutive) with an employer, an employee has a right to a percentage of his accrued benefit derived from employer contributions which is nonforfeitable other than by reason of death. The percentage shall not be less than the percentage determined under the following table:

| "Years of service | Nonforfeitable percentage |
|---|---|
| 5 | 25 |
| 6 | 30 |
| 7 | 35 |
| 8 | 40 |
| 9 | 45 |
| 10 | 50 |
| 11 | 60 |
| 12 | 70 |
| 13 | 80 |
| 14 | 90 |
| 15 or more | 100 |

. . . . ."

H.R. 2, 93d Cong., 2d Sess. § 411(a) (1974).

As has been made obvious above, I would reverse the judgment of the District Court as to the requirement that pensions be awarded to any claimant with less than five years of signatory employment. As to other issues presented, I join the opinion of the court.

